193 P.3d 1228

**In the Interest of "A" CHILDREN:**
**N.A., M.A.(1), M.A.(2), and L.A.**
**(FC–S No. 03–09383).**

**and**

**In the Interest of J.A. (FC–**
**S No. 03–09384).**

**Nos. 28129, 28130.**

Intermediate Court of Appeals of Hawai'i.

July 31, 2008.

Joseph Dubiel for father-appellant.

Herbert Y. Hamada for mother-appellee/cross-appellant.

Patrick A. Pascual, deputy attorney general (Mary Anne Magnier, deputy attorney general, with him on the briefs) for petitioner-appellee Department of Human Services.

WATANABE, PRESIDING J., NAKAMURA, and FUJISE, JJ.

Opinion of the Court by WATANABE, Presiding J.

This consolidated appeal arises from two cases in the Family Court of the First Circuit (family court) that culminated on August 14, 2006 with orders (August 14, 2006 Orders) that (1) divested Father–Appellant (Father) of his parental and custodial rights [1] in J.A. and L.A.[2] (collectively, Sons), his biological

---

1. Under the August 14, 2006 Orders and consistent with that part of the definition of "[p]ermanent custody" in Hawaii Revised Statutes (HRS) § 587–2(2) (1993), Father remained responsible for the support of Sons, "including, but not limited to, the payment for the cost of any and all care, treatment, or any other service supplied or provided by the permanent custodian, any subsequent permanent custodian/s, other authorized agency, or the Court for [Sons'] benefit" until Sons were legally adopted.

2. L.A. was born while Mother was married to Deceased Husband. Deceased Husband was therefore the presumed natural father of L.A. pursuant to HRS § 584–4(a) (1993), which states, in part: "A man is presumed to be the natural father of a child if [h]e and the child's natural mother are or have been married to each other and the child is born during the marriage[.]" It is not clear from the record whether Deceased Father was listed as L.A.'s father on L.A.'s birth certificate.

sons with Mother–Appellant (Mother), and awarded permanent custody over Sons to the Director of the Department of Human Services, State of Hawai'i (DHS); and (2) divested Mother of her parental and custodial rights [3] in Sons, as well as N.A., M.A.(1), and M.A.(2) (collectively, Triplets), her three daughters with a man who died in August 2002 (Deceased Husband), and awarded permanent custody over Sons and Triplets (collectively, Children) to DHS.

We affirm the August 14, 2006 Orders as to Mother. However, we hold that Father was denied his right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution, when he was not provided with appointed counsel until sixteen days prior to the trial on DHS's motion for permanent custody. Accordingly, we vacate the August 14, 2006 Orders as to Father and remand for further proceedings consistent with this opinion.

## BACKGROUND

These two cases are unfortunately typical of the majority of child-protective cases that this court sees on appeal. We set forth the factual and procedural history of these cases in detail to highlight the complex legal, social, and procedural issues that are often involved in these cases, especially for parents who have tested positive for drugs and are threatened with the prolonged or permanent deprivation of their parental and custodial rights in their children.

### A. The Petitions Seeking Family Supervision of Triplets and Foster Custody of Sons

On November 5, 2003, DHS received a report that Mother and her newborn son, J.A., had tested positive for amphetamines and methamphetamine and that Mother had not engaged in any prenatal services. The next day, DHS interviewed Mother, who admitted that she had smoked "ice" the day prior to J.A.'s birth. Mother then signed a Voluntary Foster Custody Agreement with DHS, allowing DHS to place Sons in a foster home.

On November 18, 2003, DHS filed two petitions in the family court. In FC–S No. 03–09383 (Case 1), DHS filed a petition that sought foster custody [4] over L.A. and family

---

3. Under the August 14, 2006 Orders, Mother remained responsible for the support of Children until they were legally adopted. *See* footnote 1.

4. HRS § 587–2 (2006), which is part of HRS chapter 587, the Child Protective Act, defines "foster custody" as follows:

"Foster custody" means the legal status created pursuant to this section, section 587–21(b)(2), or by an order of court after the court has determined that the child's family is not presently willing and able to provide the child with a safe family home, even with the assistance of a service plan.

(1) Foster custody vests in a foster custodian the following duties and rights:

(A) To determine where and with whom the child shall be placed in foster care; provided that the child shall not be placed in foster care outside the State without prior order of the court; provided further that, subsequent to the temporary foster custody hearing, unless otherwise ordered by the court, the temporary foster custodian or the foster custodian may permit the child to resume residence with the family from which the child was removed after providing prior written notice to the court and to all parties, which notice shall state that there is no objection of any party to the return; and upon the return of the child to the family, temporary foster custody, or foster custody automatically shall be revoked and the child and the child's family members who are parties shall be under the temporary family supervision or the family supervision of the former temporary foster custodian or foster custodian;

(B) To assure that the child is provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, supervision, and other necessities;

(C) To monitor the provision to the child of appropriate education;

(D) To provide all consents which are required for the child's physical or psychological health or welfare, including, but not limited to, ordinary medical, dental, psychiatric, psychological, educational, employment, recreational, or social needs; and to provide all consents for any other medical or psychological care or treatment, including, but not limited to, surgery, if the care or treatment is deemed by two physicians or two psychologists, whomever is appropriate, licensed or authorized to practice in this State to be necessary for the child's physical or psychological health or welfare, and the persons who are otherwise authorized to provide the consent are unable or have

supervision[5] of Triplets. The petition in Case 1 alleged, in part, that Deceased Husband reportedly died of a heart attack in August 2002; Father was the "boyfriend" of Mother and "the biological father of [L.A.]"; Mother had signed a voluntary custody agreement that allowed DHS to place Sons in a child-specific foster home; DHS had confirmed the threats of abuse and neglect of Children due to Mother's use of illicit drugs and was requesting foster custody over Sons and family supervision over Triplets; DHS had assessed that Mother could provide a safe family home for Triplets; Mother appeared willing to engage in recommended services as she had admitted to using drugs and needing help with her drug problem, but Father's willingness to participate in services was unknown to DHS; Mother reported no history of domestic violence or mental health issues, was formerly employed at a distribution center, and had no criminal conviction record in Hawai'i; and Father was employed as a mason and had a purported history of substance abuse, no reported mental health issues, and several prior convictions.[6] The petition prayed that an inquiry be made into the allegations and that action be taken pursuant to the provisions of HRS chapter 587, the Child Protective Act.

In FC–S No. 03–09384 (Case 2), DHS filed a petition seeking foster custody over J.A.

---

refused to consent to the care or treatment;

   (E) To provide consent to the recording of a statement pursuant to section 587–43; and

   (F) To provide the court with information concerning the child that the court may require at any time.

(2) The court, in its discretion, may vest foster custody of a child in any authorized agency or subsequent authorized agencies, in the child's best interests; provided that the rights and duties which are so assumed by an authorized agency shall supersede the rights and duties of any legal or permanent custodian of the child, other than as is provided in paragraph (4).

(3) An authorized agency shall not be liable to third persons for the acts of the child solely by reason of the agency's status as temporary foster custodian or foster custodian of the child.

(4) Unless otherwise ordered by the court, a child's family member shall retain the following rights and responsibilities after a transfer of temporary foster custody or foster custody, to the extent that the family member possessed the rights and responsibilities prior to the transfer of temporary foster custody or foster custody, to wit: the right of reasonable supervised or unsupervised visitation at the discretion of the authorized agency; the right to consent to adoption, to marriage, or to major medical or psychological care or treatment, except as provided in paragraph (1)(D); and the continuing responsibility for support of the child, including, but not limited to, repayment for the cost of any and all care, treatment, or any other service supplied or provided by the temporary foster custodian, the foster custodian, or the court for the child's benefit.

5. HRS § 587–2 defines "family supervision" for purposes of HRS chapter 587 as follows:

   "Family supervision" means the legal status created pursuant to this section, section 587–21(b)(2), or by an order of court after the court has determined that the child is presently in the legal or permanent custody of a family which is willing and able, with the assistance of a service plan, to provide the child with a safe family home. Family supervision vests in an authorized agency the following duties and rights, subject to such restriction as the court deems to be in the best interests of the child:

   (1) To monitor and supervise the child and the child's family members who are parties, including, but not limited to, reasonable access to each of the family members who are parties, and into the child's family home; and

   (2) To have authority to place the child in foster care and thereby automatically assume temporary foster custody or foster custody of the child. Upon placement, the authorized agency shall immediately notify the court. Upon notification, the court shall set the case for a temporary foster custody hearing within three working days or, if jurisdiction has been established, a disposition or a review hearing within ten working days of the child's placement, unless the court deems a later date to be in the best interests of the child.

   An authorized agency shall not be liable to third persons for acts of the child solely by reason of its possessing the status of temporary family supervision or family supervision in relation to the child.

6. The petitions alleged that Father had prior convictions for revocation/modification of probation in August 1999, promotion of a dangerous drug in the second degree in January 1997, criminal contempt of court in April 1994 and October 1993, and disorderly conduct in October 1991.

The petition identified Father as the "Alleged Natural Father" of J.A. and included allegations similar to those alleged in the petition in Case 1.

The last page of both petitions included the following paragraph:

> *UNLESS THE FAMILY IS WILLING AND ABLE TO PROVIDE THE CHILDREN WITH A SAFE FAMILY HOME, EVEN WITH THE ASSISTANCE OF A SERVICE PLAN, WITHIN A REASONABLE PERIOD OF TIME, THEIR RESPECTIVE PARENTAL AND CUSTODIAL DUTIES AND RIGHTS SHALL BE SUBJECT TO TERMINATION.*

Attached to both petitions were two summonses, one addressed to Mother at an address in 'Ewa Beach, and the other to Father, "Address Unknown."

On November 24, 2003, the family court entered an order appointing Chris C. China, Esq. (China) as guardian ad litem (GAL) for Children in both cases. On August 23, 2004, the family court entered an order that discharged China as GAL, retroactive to June 30, 2004, due to the expiration of an agreement to provide GAL services, and appointed Matthew T. Ihara, Esq. as GAL for Children. The record indicates that Children were represented by a GAL throughout the proceedings below.

B. *The December 1, 2003 Hearing on the Petitions and Appointment of Initial Counsel for Mother*

Although Father had not yet been served with the petitions in Cases 1 and 2 and

Mother had not filed any answer to the petitions, the family court[7] held a consolidated hearing on DHS's petitions in Cases 1 and 2 on December 1, 2003. Mother, but not Father, was present at the hearing.

Following the hearing, the family court entered orders concerning Child Protective Act (December 1, 2003 Orders) that (1) awarded DHS foster custody over Sons and family supervision over Triplets; (2) ordered implementation of a Family Service Plan dated November 7, 2003;[8] (3) ordered the parties to appear at a review hearing on June 25, 2004, at 9:30 a.m.; (4) ordered DHS to submit a report and plan to the family court two weeks prior to the June 25, 2004 review hearing; (5) ordered the GAL to submit a report to the family court one week prior to the June 25, 2004 review hearing; and (6) provided that Children shall not be removed from the island of O'ahu without a court order or the prior written approval of DHS and GAL.

These orders were predicated on the family court's findings that (1) continuation in the family home would be contrary to Sons' immediate welfare; (2) DHS had made reasonable efforts to prevent or eliminate the need for Sons to be removed from the family home and to reunify Sons with Mother and Father (collectively, Parents); (3) there is reasonable cause to believe that continued placement in emergency foster care is necessary to protect Sons from imminent harm; and (4)

---

7. Unless otherwise noted, the Honorable Paul T. Murakami (Judge Murakami) presided over all the child-protective proceedings in the family court in Cases 1 and 2.

8. The Family Service Plan was signed by Mother, but not Father. The plan required Mother and Father (collectively, Parents) to (1) participate in a drug assessment and possible treatment program, (2) undergo psychological evaluations, (3) follow the recommendations of the psychological evaluation regarding treatment (4) attend parenting classes, (5) engage in family counseling, (6) complete an anger management program, and (7) cooperate with the DHS social worker in specified ways. The plan also set forth the consequences of the plan:

  A. If you successfully complete and utilize the services that are outlined in this service plan, you should then be able to demonstrate that [Children] are no longer at risk of abuse or neglect in the family home. Once you are able to demonstrate you can provide a safe family home for [Children], without further protective services, the department can then recommend that this case be closed.

  B. YOUR PARENTAL AND CUSTODIAL DUTIES AND RIGHTS CONCERNING [CHILDREN] WHO ARE SUBJECT OF THIS FAMILY SERVICE PLAN, MAY BE TERMINATED BY AN AWARD OF PERMANENT CUSTODY UNLESS YOU ARE WILLING AND ABLE TO PROVIDE [CHILDREN] WITH A SAFE FAMILY HOME WITHIN THE REASONABLE PERIOD OF TIME SPECIFIED IN THIS FAMILY SERVICE PLAN.

in light of the reports submitted by DHS pursuant to HRS § 587–40 (Supp.2002) and the family court record, there was an adequate basis to determine that Children's physical or psychological health or welfare had been harmed or were subject to threatened harm by the acts or omissions of Children's family. The December 1, 2003 Orders also noted that Mother had knowingly and willingly waived her right to counsel for that day's proceedings and had knowingly and willingly stipulated to jurisdiction, foster custody of Sons, family supervision of Triplets, and the November 7, 2003 family service plan.

On December 2, 2003, the family court entered an order appointing attorney Carole D. Landry (Landry) as Mother's counsel.

### C. *DHS's Assumption of Foster Custody of Triplets*

On December 30, 2003, DHS filed in Case 1(1) an *ex parte* motion for an order shortening time for a notice of motion for an immediate review; and (2) a motion for an immediate review hearing that was scheduled for December 31, 2003, the next day. The basis for these motions was that DHS had assumed foster custody of Triplets on December 16, 2003, upon discovery that Mother had continued to drink alcohol and use drugs after the December 1, 2003 hearing and was scheduled to enter the Salvation Army Addiction Treatment Services (SATS) residential drug treatment program sometime in January 2004.

Neither Mother, Father (who still had not been served with the original petitions), GAL, nor Landry appeared at the December 31, 2003 hearing, which was continued until January 9, 2004. An amended notice informing Mother and GAL, but not Father, of the date of the continued hearing on January 9, 2004 was not filed in the family court until January 7, 2004, and it is unclear from the record when Mother and GAL were served with the motion.

At the January 9, 2004 hearing, Mother, Landry, Father, and GAL were again absent. Following the hearing, the family court entered its orders concerning Child Protective Act in Case 1, which continued foster custody of Sons, ordered all parties to appear at a review hearing on May 25, 2004, granted DHS's December 30, 2003 motion to assume foster custody of Triplets, and provided that Mother's counsel and GAL "shall have 30 days to submit objections."

### D. *Service on Father of Some Documents and the Petition in Case 1 at the March 4, 2004 Hearing*

On February 12, 2004, after several allegations surfaced that the Triplets may have faced inappropriate sexual behavior by their paternal uncle while in foster care, DHS filed a motion for an immediate review to make paternal uncle a limited party[9] (motion for immediate review). At the March 4, 2004 hearing on this motion, both Parents were present, and Father was served in court with the following documents: "a summons, motion filed on 2/12/04, petition [for Case 1], safe family home report dated 11/7/03 & service plan dated 11/7/03." However, Father was not served with the petition in Case 2 until November 16, 2004. Moreover, it does not appear that Father was served with the December 1, 2003 orders concerning Child Protective Act, which ordered the parties to appear at a May 25, 2004 review hearing for Cases 1 and 2.

At the March 4, 2004 hearing, the family court questioned Father about his paternity as to J.A.:

> THE COURT: I'm sorry, [Father], you're J.A.'s father?
>
> [FATHER]: Yeah.
>
> THE COURT: [J.A.'s] father. Are you on the birth certificate?
>
> UNIDENTIFIED FEMALE: No.
>
> THE COURT: He's not?
>
> UNIDENTIFIED FEMALE: No.

---

**9.** The motion was filed after DHS learned that the Triplets' paternal aunt (Aunt), who was Deceased Husband's sister and their foster mother, had filed a request for a temporary restraining order against Aunt's brother (paternal uncle) to protect the Triplets against sexually inappropriate behavior by paternal uncle. The family court issued the restraining order and directed that paternal uncle "shall not be alone with girls."

THE COURT: Okay. So that's at this point, it's what we call an alleged father then. Okay, that's fine.

[DEPUTY ATTORNEY GENERAL]: I have—

[FATHER]: Is it possible that I can get on?

THE COURT: There are—there are two ways to do it. One way is what we call an expedited paternity where both of you agree, and then we can dispense with the—you know, the DNA test, everything else. And if you both agree, I can declare [Father] to be J.A.'s father. That's way number one. Way number two is if you folks, for whatever reason, decide you need a test or a hearing or something else, you have to go to what's called the Corporation Counsel and do—it's a more drawn-out process, but the result is the same.

If you need to talk about it, you can do that, okay? Not right now.

[FATHER]: Okay.

THE COURT: Let's take care of some other things.

[FATHER]: Okay.

The family court never returned to the subject of Father's paternity of J.A. at the March 4, 2004 hearing and did not inquire about Father's paternity of L.A. at the hearing. Moreover, the family court did not advise Father of the right to be represented by counsel and that counsel may be appointed to represent Father if he were indigent. The family court also did not secure an on-the-record waiver from Father of his right to be represented by counsel.

### E. The May 25, 2004 Review Hearing

Mother, but not Father,[10] appeared at the May 25, 2004 review hearing. Following that hearing, the family court issued orders concerning Child Protective Act in both Cases 1 and 2 that (1) continued foster custody, (2) ordered the Family Service Plan dated May 7, 2004, and (3) ordered "[a]ll parties . . . to appear at a review hearing on November 16, 2004 at 8:30 a.m., before the presiding judge[.]" The May 7, 2004 Family Service Plan was very similar to the November 7, 2003 Family Service Plan.

### F. The Return of Children to Parents

On September 24, 2004, after Triplets had been in foster custody for over eight months, Parents had completed drug abuse treatment programs, and Parents had demonstrated a commitment to obtaining and participating in court-ordered services, DHS returned Triplets to Mother's care and assumed family supervision over them. Sons were returned to Parents on November 12, 2004, and for the first time since J.A. was born, all five Children lived together with Parents in the family home.

Parents, GAL, and a consulting counsel[11] appearing specially on behalf of Mother were all present at the November 16, 2004 review hearing. At the outset of the hearing, the family court asked Father about his paternity of J.A.:

THE COURT: . . . . [Father], I apologize and we've gone through this before, but you're not on J.A.'s birth certificate?

[FATHER]: No.

THE COURT: You're not. Just checking. Thank you.

(Formatting altered.) The deputy attorney general representing DHS then informed the family court that

this case has been going very well, and parties are to be congratulated for their progress. As a result, [Triplets] were reunified on September 24, 2004. [DHS] assumed family supervision [of Triplets], and [DHS] also assumed family supervision of [Sons] as of November 12, 2004. [DHS] is asking that family supervision of all the [C]hildren be continued and to order the service plan of October 29, 2004.

The family court thereafter entered orders concerning Child Protective Act that continued family supervision over Children and ordered all parties to appear at a review hearing on May 10, 2005.

---

10. As noted above, it does not appear from the record that Father was officially notified of the May 25, 2004 review hearing.

11. See infra footnote 13.

## G. *The Family Court's Discharge of Landry*

On November 26, 2004, an order was entered by the Senior Judge of the Family Court of the First Circuit[12] that appears in the record on appeal for Case 1 (but not Case 2), which "discharged, *nunc pro tunc*, as of June 30, 2004[,]" various "service contract attorneys appointed for parents and other parties in cases under H.R.S. chapter 587 in the Family Court of the First Judicial Circuit[.]" Landry was among the attorneys discharged by the order and directed to "turn over any and all documents and any other relevant information to the designated Family Court 'Ho'olokahi' staff person within two weeks of receipt of [the] Order." Thereafter, Mother was assisted at court hearings by only a "consulting counsel."[13]

## H. *The May 10, 2005 Review Hearing*

At the May 10, 2005 review hearing, which both Parents attended,[14] a DHS social worker informed the family court[15] that Parents had made private arrangements with family members to provide respite care to Children (in two different households) while Parents worked on personal issues. Some of the issues that Parents were addressing were identified in a Safe Family Home Report dated April 25, 2005, which was prepared by DHS social worker Erin Yamashita (Yamashita) for the May 10, 2005 review hearing.

According to the report, (1) on January 13, 2005, Father returned home from work tired and asked Mother to have Children leave the bedroom so he could rest, but Triplets were swearing at each other and disrespecting Parents, and M.A.(1) swore at Father before leaving the bedroom; (2) Father then became upset and threw a cordless phone, which hit the floor and broke apart, causing the top part of the phone to bounce and hit the back of M.A.(1)'s leg, causing a scratch; (3) Parents were removed from the Hina Mauka random-urinalysis-monitoring program on December 14, 2004 due to "no shows" (failures to show up for a urinalysis, resulting in a presumption of drug use) on two dates; (4) Parents were terminated from a parenting skills educational program in February due to four missed classes, which Mother attributed to child-care difficulties and relationship problems between Parents; and (5) on March 30, 2005, after M.A.(1)

12. The order was entered by the Honorable Frances Q.F. Wong.

13. During oral arguments on appeal, Mother's appellate counsel, Mr. Herbert Hamada (Mr. Hamada), who was Mother's attorney at the permanent-custody trial and specially appeared at several hearings as her consulting counsel, stated that the Hawai'i State Judiciary has a contract for the services of several consulting counsel who report to a lead attorney. According to Mr. Hamada, prior to a hearing, the lead attorney assigns a consulting counsel to provide legal assistance to parents who must make a court appearance at that hearing. At the hearing, the assigned consulting counsel enters a "special appearance" on behalf of a parent because acting as a consulting counsel does not establish an attorney-client relationship with the parent. Essentially, Mr. Hamada explained, the parent is appearing *pro se*, but is given the resources of a standby consulting attorney to assist the parent at the hearing. *Cf. In re D.W.*, 113 Hawai'i 499, 500–01, 155 P.3d 682, 683–84 (App.2007) (explaining that the family court was "experimenting with the appointment of 'consulting attorneys' for parents who will then proceed on a pro se basis.... The consulting attorneys will work with these parents only at the courthouse.") Mr. Hamada noted that while the lead attorney attempts to assign the same consulting counsel to appear at different hearings for a parent, it is not always possible for the same attorney to appear for the parent.

It was also confirmed at oral argument that a consulting counsel is not provided with copies of the pleadings and other court records relevant to a particular parent for whom a "special appearance" will be made. Instead, a consulting counsel must review the family court's files in order to prepare for a hearing. Furthermore, this court was informed that although HRS § 587–40 (2006) requires DHS to submit reports on the progress of the parties at least fifteen days prior to a review hearing, as a practical matter these reports are seldom filed until a day prior to the hearing. Consequently, consulting counsel must generally review the required reports immediately prior to a hearing. Mother did not challenge the adequacy or effectiveness of her various consulting counsel on appeal. However, if the representations made at oral argument are true, then we have deep concerns about whether the consulting-counsel program, as applied, satisfies the requirements of due process.

14. At the hearing, Mother was assisted by consulting counsel. Father was not represented or assisted by counsel.

15. The Honorable Matthew J. Viola presided.

reportedly swore at Father and disobeyed orders to clean her room (M.A.(1) had broken up pieces of white styrofoam, which were all over Triplets' bedroom), Father allegedly pinched M.A.(1)'s right cheek, causing a slight swelling to M.A.(1)'s upper right lip.

Following the May 10, 2005 hearing, the family court continued family supervision but ordered Children to remain with the respective family members who had been caring for them. The family court also ordered all parties to appear at a review hearing on August 11, 2005.

### I. The Revocation of Family Supervision and Award of Foster Custody to DHS

On July 5, 2005, DHS assumed "placement responsibility" of Children because Parents had "not actively engaged in services and ha[d] not demonstrated their ability to adequately provide ... a safe, stable home for [Children]." DHS stated that Parents' "gradual decline in motivation" was confirmed by Mother's cancellation of two appointments for a family therapy session and Parents' failure to provide financial support and assistance to the family members caring for Children.

Consequently, on July 18, 2005, DHS filed an ex parte motion for an order shortening time for a notice of motion for an immediate review hearing, which the family court granted, and a motion for an immediate review hearing, which was set for the next day at 8:30 a.m. (July 18, 2005 motion). Attached to the motions were an updated Safe Family Home Report dated July 11, 2005, in which DHS asked the family court to revoke family supervision and award foster custody of Children to DHS; an updated Family Service Plan dated July 11, 2005; and a notice of the motions addressed to Mother, Father, and GAL.

At the July 19, 2005 hearing a day later, neither Mother, Father, nor consulting counsel was present. In response to an inquiry

from the family court, the deputy attorney general appearing for DHS acknowledged that service of the motions had not been effectuated because she was "holding mother and father's motions in [her] hand."

Following the hearing, the family court entered orders concerning Child Protective Act, which, among other things, determined that (1) continuation in the family home would be contrary to Children's immediate welfare; (2) DHS had made reasonable efforts to reunify Children with Parents; (3) "[e]ach party present at the hearing [16] understands that unless the family is willing and able to provide the child(ren) with a safe family home, even with the assistance of a service plan, within a reasonable period of time stated in the service plan, their parental and custodial duties and rights shall be subject to termination"; and (4) "[e]ach term, condition, and consequence of the service plan dated July 11, 2005 ... has been explained to and is understood by *each party present* at the hearing[.]" (Emphases and footnote added.) The family court also continued the foster custody over Children that DHS had assumed on July 5, 2005, ordered all parties to appear at a review hearing on August 11, 2005, and continued DHS's July 18, 2005 motion. The record does not indicate that Parents were served with a copy of the July 19, 2005 orders concerning Child Protective Act.

### J. The August 11, 2005 Review Hearing

Father was not present at the August 11, 2005 review hearing.[17] The family court entered orders concerning Child Protective Act (August 11, 2005 orders) that defaulted him "for failure to appear" and provided that "notice of future hearings" to Father in both cases "is waived[.]" The August 11, 2005 orders also granted DHS's July 18, 2005 motion for an immediate review hearing and ordered "[a]ll parties" to appear at a review hearing at 8:30 a.m. on November 23, 2005.[18]

---

16. As indicated earlier, neither Mother nor Father was present at the July 19, 2008 hearing.

17. As noted above, Parents were not in court on July 19, 2005 when the family court entered orders directing them to appear at the August 11, 2005 review hearing.

18. Although the August 11, 2005 orders directed "all parties" to appear at the November 23, 2005 review hearing, the record does not indicate that Father was provided with a copy of the orders. Moreover, the August 11, 2005 orders specifically

### K. *The Motion for Permanent Custody*

On November 21, 2005, at 11:27 a.m. in Case 1 and 11:30 a.m. in Case 2, less than forty-eight hours before the November 23, 2005 review hearing, DHS filed (1) an ex parte motion for an order shortening time for a notice of motion for an order awarding permanent custody and establishing a permanent plan (*ex parte* motion); (2) an order shortening time for a notice of motion for an order awarding permanent custody and establishing a permanent plan;[19] and (3) a motion for an order awarding permanent custody and establishing a permanent plan. The *ex parte* motion noted that a review hearing was scheduled for November 23, 2005, "which does not allow [DHS] enough time to file the Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan and notice to parties prior to the required 48 hours deadline[,]" and requested, in the interest of "judicial economy[,]" that the motion seeking permanent custody and establishing a permanent plan be filed and set for the November 23, 2005 review hearing.

Attached to the motions was an affidavit by Yamashita, expressing her opinion that there exists clear and convincing evidence to award permanent custody of Children to DHS and establish a permanent plan with respect to Children.

Also attached to the motions was a Safe Family Home Report dated November 8, 2005, which indicated that (1) Mother admitted to drug usage since May 2005; (2) Mother stated that she and Father "have smoked 'ice' in the family home as recently as September 2005"; (3) Mother had enrolled herself into the Intensive Outpatient Program at Hina Mauka and was no longer residing with Father; (4) Mother was currently residing with her father and reported having a job with a food-manufacturing company; (5) Father and Mother were both removed from the Waipahu Hina Mauka program on September 17, 2005 due to their respective "no

shows" for random urinalysis on September 8 and 17, 2005; (6) Parents had not yet participated in family therapy services; (7) Parents had not completed parenting classes; and (8) Father had not yet engaged in any anger management and domestic violence programs. The Safe Family Home Report stated that DHS was "convinced" that both Parents "are not able to provide [Children] with a safe and stable family home, both now and in the reasonabl[y] foreseeable future, even with the assistance of a service plan" and recommended that permanent custody of Children be granted to DHS, with the eventual goal of adoption of Triplets by their paternal aunt [Deceased Husband's sister] and her husband and adoption of Sons by their paternal uncle [Father's brother] and his wife.

The motions were accompanied by a notice of motion dated November 21, 2005 that was addressed to Mother at her home address and to GAL. There was no notice of motion addressed to Father.

Mother, a consulting counsel specially appearing with Mother, and GAL were present at the November 23, 2005 review hearing. Father was not present, and at DHS's request, the family court continued Father's default. The family court then noted that two matters were on the calendar. "One is a review. The second is a motion [for permanent custody] proffered by [DHS]." The following discussion then took place between the family court and the deputy attorney general representing DHS:

> [DEPUTY ATTORNEY GENERAL]: Yes. Judge, I apologize for the lateness [of the motion]. It was my fault.... I would—I could argue that [Father], having been defaulted, really isn't entitled to notice for the motion on permanent custody. However, in the abundance of caution, I would ask the court to give me just one month to attempt to—to mail the motion for permanent custody to [Father's] address ..., particularly on—on [J.A.'s] case

stated that notice to Father of future hearings was "waived."

**19.** The order shortening time on notice of motion for an order awarding permanent custody and establishing a permanent plan in Cases 1 and 2

were stapled to, and filed with, the motion for order awarding permanent custody and establishing a permanent plan filed by DHS in Cases 1 and 2, respectively.

because he's the father—he's the alleged father of [J.A.].

THE COURT: He's the dad? He's [J.A.'s] father?

[MOTHER'S CONSULTING COUNSEL]: Yes, Your Honor.

THE COURT: The other children as well, if I understand it, correct.

[MOTHER'S CONSULTING COUNSEL]: No, the other children have another father who's now deceased.

THE COURT: Oh, I'm sorry, that's right. Apologize. Thank you.

At that point, Mother's consulting counsel mentioned that she had not seen a copy of the motion for permanent custody and requested a courtesy copy and that the review hearing be continued until Father had been served with the motion.

At the end of the hearing, the family court entered orders concerning Child Protective Act (November 23, 2005 Orders) that, among other things, continued foster custody; continued the service plan dated July 15, 2005; ordered the parties to appear at 9:30 a.m. on December 28, 2005 for a review hearing; and continued the motion for permanent custody. The November 23, 2005 Orders noted the absence of Father and indicated that he was "defaulted at the hearing on 8/11/05." The family court orally instructed the deputy attorney general "to expeditiously deal with [Father's] situation."

The record on appeal for Case 2 includes a summons with an original signature of a clerk of the family court, notifying Father that his parental and custodial duties may be terminated at a hearing scheduled for December 28, 2005, at 9:30 a.m. and commanding him to appear personally at the hearing. However, there is no return of service filed in the record to indicate that the summons was served on Father.

The record for Case 2 also includes a certificate of service signed by a deputy attorney general and filed on December 1, 2005 and another certificate of service signed by the same deputy attorney general and filed

on January 13, 2006 that both attest that copies of the following documents were mailed to Father at a Mililani address by United States mail, postage prepaid, on November 28, 2005:(1) the motion for order awarding permanent custody and establishing a permanent plan set for November 28, 2005, at 8:30 a.m.; (2) the ex parte motion for an order shortening time for a notice of motion for an order awarding permanent custody and establishing a permanent plan scheduled for November 23, 2005; and (3) the November 23, 2005 Orders. The November 8, 2005 Supplemental Safe Family Home Report, however, indicated that Parents were no longer living together. Thus, it is not apparent from the record that Father actually received the documents mailed to him.

### L. The December 28, 2005 Review Hearing

Mother, GAL, and a consulting counsel appearing with Mother were present at the December 28, 2005 review hearing, but Father was not present.[20] The deputy attorney general reminded the court that Father had been defaulted on August 11, 2005 and requested, successfully, "that default be continued." Following the hearing, the family court entered orders concerning Child Protective Act that, in relevant part, (1) continued foster custody; (2) continued the July 15, 2005 service plan; (3) ordered all parties to appear at a pretrial hearing on February 15, 2006, at 8:30 a.m.; (4) ordered DHS to submit a report and plan two weeks prior to the February 15, 2006 pretrial hearing; and (5) ordered GAL to submit a recommendation/objection statement one week prior to the February 15, 2006 pretrial hearing.

### M. The February 15, 2006 Pretrial Hearing

Father appeared at the February 15, 2006 pretrial hearing, and his default was set aside prospectively. Mother also appeared and was represented by an attorney, not a "consulting counsel." At the hearing, the follow-

---

**20.** As noted above, it is not clear from the record whether Father received prior notice of the De-

cember 28, 2005 hearing.

ing colloquy occurred between the family court and Father:

THE COURT: You—*because you are the alleged natural father, I cannot give you an attorney at this point.* However, you're free to present whatever witnesses or evidence you want to in this trial because you are a participant. You have any evidence or witnesses that you intend to call? Just yourself possibly?

[FATHER]: Yeah.

(Emphasis added.) Following the hearing, the family court entered orders concerning Child Protective Act that ordered the parties to appear at the February 28, 2006 trial at 8:30 a.m. Additionally, Father's default was set aside.

## N. *The Rescheduling of the February 28, 2006 Trial*

On February 28, 2006, Mother, Father, Mother's attorney, and GAL appeared for the scheduled trial. At the outset of the hearing, the deputy attorney general representing DHS informed the family court that Father's paternity of Sons had not yet been established and "because financial responsibility for children does continue after the award of permanent custody, and we can't guarantee that the adoption will take place right away[,]" it was necessary to resolve the paternity issue and continue the trial. The deputy attorney general further explained that the paternity issue was "slightly complicated by the fact that [Mother] was married and ... all the four [older] children were born within that marriage." Mother also informed the family court that L.A. had Deceased Husband's last name and was receiving social security benefits as a beneficiary of Deceased Husband.

The family court then rescheduled trial for May 9, 2006, at 8:30 a.m. and ordered the parties to appear for a further pretrial hearing on March 24, 2006, at 8:30 a.m.

## O. *The Establishment of Father's Paternity*

At the March 24, 2006 pretrial hearing, the deputy attorney general representing DHS, on behalf of the City and County of Honolulu Corporation Counsel,[21] served on Parents a petition to establish the paternity of Sons. The deputy attorney general also stated to the family court:[22] "[O]bviously if [F]ather becomes adjudicated father [of Sons], he would have an opportunity to have counsel appointed by the court." The family court then engaged in the following colloquy with Father:

THE COURT: [Father]—

[FATHER]: Yes.

THE COURT:—you understand that with respect to [J.A.] that—that you have the right to a genetic test if you wanted to determine paternity?

[FATHER]: Right.

THE COURT: And one of the—one of the questions they're going to ask you in the paternity case is, first of all, *whether you want time to speak with a lawyer concerning the—the paternity of the child,* number two, whether you want a genetic test which can be arranged but will take some time and, number three, whether you want to admit to paternity of the child.

Now, for our purposes here, *if you are adjudicated or if you admit that you are the father of the child, then we have to make you a party to this case and get you a lawyer. So I guess the question at this point is whether you want to admit to paternity or whether you want to take a genetic test or whether you want to talk to a lawyer about that.*

[FATHER]: I would—yes, *I would rather see a lawyer* before (indiscernible)—

THE COURT: Fair enough.

[FATHER]:—yeah.

21. HRS §§ 584–6 (1993) and 584–9 (1993 & Supp.1998), which are part of the Uniform Parentage Act, HRS chapter 584, authorize the county attorney or the corporation counsel for a county to represent the child support enforcement agency (CSEA) when an action is brought by CSEA for the purpose of declaring the existence or nonexistence of a father-and-child relationship.

22. Judge William J. Nagle III (Judge Nagle) presided.

THE COURT: Fair enough. Then in that case, why don't we set this for the week after the 21st. That way, [Father], we'll know, you know, what's going to happen with you, whether you're going to get a genetic test or just, you know, what your situation is.

[FATHER]: Okay.

THE COURT: And we can make some plans for—for this case.

[DEPUTY ATTORNEY GENERAL]: And for the record, Your Honor, he is a party. He's just named as father as alleged natural (indiscernible).

(Emphases added.) The family court then continued the hearing until April 26, 2006 and instructed Father to be present for that hearing. The family court also informed Father that if he wished, he could go to Courtroom 2 and fill out paperwork to take a genetic test to establish his paternity of Sons. Mother was excused from attending the April 26, 2006 hearing.

At the April 26, 2006 hearing, DHS asked for a continuance of trial because Father had asked for counsel in the paternity case and "the next date on the paternity [case] is May 12." The family court [23] then asked Father a number of questions:

THE COURT: [Father], did you—. . . take a genetic test?

[FATHER]: No.

THE COURT: Why not?

[FATHER]: I'm the father. It's just that I didn't know what really today was about. So I didn't answer the—the lady when I came to court last week.

THE COURT: Okay, but what is your paternity trial for? What is—what is that—

[FATHER]: I don't know.

THE COURT:—trial

[FATHER]: I just met her—I met her—I didn't even go to court last week. All I did was meet that lady outside for the paternity or, you know, child support or something.

THE COURT: Has [Father] been established as the father?

[DEPUTY ATTORNEY GENERAL]: That's what we're trying to do, establish him as the adjudicated father.

THE COURT: [Father], do you want an attorney to talk to about whether you're the father of the—the children here?

[FATHER]: Well, I just—you know, I didn't understand what today was so I didn't answer her last time, you know, yeah. So—so she—

THE COURT: Well, today was—

[FATHER]:—set another date—

THE COURT:—supposed to be the day that we find out whether you're the father of all or some of these kids.

[FATHER]: Right.

THE COURT: Okay. And now I understand that there's a trial to determine that that has been set in May.

[FATHER]: Oh, I never—

[DEPUTY ATTORNEY GENERAL]: I don't really—I don't know the—I don't know if it's the trial that's set in May. I'm asking to continue our permanent custody trial that's set for May 9th.

THE COURT: Well, what is the May 12th hearing?

[DEPUTY ATTORNEY GENERAL]: My understanding, it's just a return so that [F]ather can appear with counsel.

THE COURT: In the paternity case?

[DEPUTY ATTORNEY GENERAL]: In the paternity case.

The family court then rescheduled the permanent custody trial for June 15, 2006 and proceeded to question Father about the trial date:

THE COURT: Okay, [Father], you understand that the new trial date on this motion for permanent custody is June 15, 2006 at 8:30 a.m.? Is that clear to you?

[FATHER]: Well, what I don't understand is that, see, the lady that I seen last week, she said that I—like I should have one attorney or something, you know, or how come—you know, if I'm not established the father or something like that, you know, why I'm—you know, like I'm in

---

**23.** Judge Nagle presided.

court like that, you know. *Do—do I need an attorney to go to trial? See, I don't have a attorney representing me.*

THE COURT: I know you don't.

[FATHER]: Right.

THE COURT: And I'm not sure what's going on with the paternity case. Has—who initiated the paternity case?

[DEPUTY ATTORNEY GENERAL]: [DHS]—father—well, father had been—this is my—this is my recollection. Father had been missing, and when he showed up, we were starting to go to trial. So *we were trying to get him established as—as adjudicated father so that he can have counsel at trial—at our FC–S trial.*

THE COURT: Mh-hm.

[DEPUTY ATTORNEY GENERAL]: So that's how we started the referral, so that he can get that done. Now—

. . . .

THE COURT: [Father], are you on the birth certificate for any of these—

[FATHER]: No—

THE COURT:—children?

[FATHER]:—I'm not. See, that's why another—okay, like—for instance, like [L.A.], okay. [L.A.], they have [Deceased Husband] as the father. But he's deceased, okay. So you know, and the worker, that day, she didn't have his—his death certificate.

THE COURT: Mh-hm.

[FATHER]: You know, so you know what I mean? On [L.A.], I don't know what's going on with [L.A.], too. That's why I never answer yes or no, you know, 'cause, you know, ... I'm the father, you know. But they told me that, you know, like [Deceased Husband] has a say. But I said [Deceased Husband] is dead, you know. You know, he's deceased, and they don't even have the birth certificate—I mean the death certificate.

THE COURT: Okay. Well, in general, [Father], as an alleged father or a supposed father, there are a number of rights that you have. First of all, you have the right to talk to a lawyer—

[FATHER]: Right.

THE COURT:—about whether you want to admit to paternity or whether you want that paternity to be proven. You have the right to a genetic test. If the genetic test demonstrates that you are the father of the child by some overwhelming probability, then you reimburse the State for the cost of the genetic test. And you always have the right to admit to the paternity of the children if that's what you want to do.

Now, there's—there's a program with Department of Health that if you want to voluntarily establish paternity for any of these children, you can go down to the Department of Health. They'll have you fill out an affidavit, which is a statement under oath in writing, that you are the father of these children and that you want the birth certificate to reflect the fact that you are the father. If you're not sure that you are the father of all or any of these children, then you may want to take a genetic test to—to either confirm or dispute your paternity.

But basically, you know, that's—that's where you are with respect to the paternity of the trial children. And, you know, *it's up to you as to what you want to do with respect to establishing paternity of any of these kids if you want to do it or speaking to an attorney. Now, do you have an attorney that you've—*

[FATHER]: No.

THE COURT:—spoken to? Okay, [Father], *I'm going to strongly suggest that you talk to an attorney about the paternity of these children, because if May 12th comes along and you haven't got an attorney* [24] *and you haven't sought legal advice on that, then the paternity case is going to move ahead irrespective of what happens there.* And they're probably going to order you to take a genetic test so that, you know, your paternity can be con-

24. HRS § 584–19 (2006) provides now, as it did during the proceedings below, that "[a]t a pretrial hearing and in further proceedings [to determine the existence or nonexistence of the pa-rental-and-child relationship,] any party may be represented by counsel. The court may appoint counsel for a party who is financially unable to obtain counsel."

clusively either demonstrated or negated one way or the other. So do you understand that?

[FATHER]: Yes. Yes.

THE COURT: Okay. So that's basically what you got to do.

[FATHER]: Okay.

THE COURT: And—and you can request to take a genetic test at any time.

[FATHER]: Okay.

THE COURT: Okay?

[FATHER]: Okay. (Indiscernible) as of the trial, I mean when we started going to trial, how do I establish—or *do you guys give me, appoint me a attorney?*

THE COURT: If—if you are confirmed as the father of any of these children—

[FATHER]: Yes.

THE COURT:—then you apply for a consulting counsel. And if you qualify based on your income for consulting counsel, then an attorney will be provided for you.

[FATHER]: Okay.

THE COURT: Okay?

[FATHER]: Yes.

THE COURT: Is that clear to you—

[FATHER]: Yes.

THE COURT:—on that?

[FATHER]: Yes.

(Footnote and emphases added.) The family court set aside the trial scheduled for May 9, 2006; ordered Father to appear for a pretrial hearing on May 30, 2006 so that the court could be updated as to the status of Father's paternity; and rescheduled trial for June 15, 2006.

At the May 30, 2006 pretrial hearing, Father was present with attorney John Choi (Choi). In response to an inquiry from the family court at the outset of the hearing, Choi stated that because he had been appointed to represent Father,[25] he assumed that Father had established paternity of Sons. After the parties, their attorneys, GAL, the DHS social worker, and the deputy prosecuting attorney failed to answer the court's question regarding the status of Father's paternity, the family court resorted to asking the court clerk, who eventually confirmed that Father's paternity over Sons had been established.

Choi then requested a continuance of the June 15, 2006 trial on Father's behalf and noted that he had just been assigned to the case and already had a hearing scheduled for June 15. Mother's attorney agreed that trial should be continued, stating that "[t]his case started November, 2004. Mr. Choi has a lot of catching up to do." However, DHS and GAL opposed the continuance. The family court denied Father's request for a continuance.

### P. *The Permanent Custody Trial*

At the trial on DHS's motion for permanent custody of Children held on June 15 and 29, 2006,[26] Choi was not present and Father appeared with a different attorney. Mother, Father, and Yamashita, the DHS social worker, testified at trial.[27]

The testimony at trial focused on Parents' inconsistent compliance with the obligations imposed on them by various Family Service Plans ordered by the family court that were aimed at helping Parents address and resolve safety issues identified by DHS. The safety

25. The record on appeal is unclear as to whether Choi was appearing as Father's attorney or "consulting counsel." The transcripts of the May 30, 2006 hearing indicate that Choi identified himself as representing Father. However, the orders concerning Child Protective Act entered by the family court following the May 30, 2006 hearing list Choi. as "consulting counsel for [Father.]"

26. The Honorable Gale L.F. Ching presided.

27. At Mother's request, DHS had subpoenaed a representative of Hina Mauka, a substance abuse treatment center which had treated both Parents, to appear at trial on June 15, 2006. However, invoking the provisions of 42 Code of Federal Regulations (CFR) § 2.13 regarding the disclosure of confidential substance abuse treatment information, Hina Mauka refused to honor the subpoena. The family court then directed Mother's attorney to prepare an appropriate motion to compel the testimony of the Hina Mauka representative. However, at the continued trial on June 29, 2008, Mother's counsel indicated that no motion had been filed and withdrew Mother's request to cross-examine a Hina Mauka representative.

issues of particular concern to DHS included Parents' "inability to appropriately address their substance-abuse issues," and "their demonstrated patterns of treatment, relapse, treatment and relapse, inappropriate parenting skills, and unresolved issues of physical and emotional abuse." DHS also noted that "[Father's] presence in the family home, as Mother's fiancé, poses a substantial risk of harm to [Triplets]." The testimony adduced and the other evidence considered by the family court revealed that although Parents had participated in and even completed some of the DHS-mandated substance-abuse-treatment programs, parenting classes, anger-management programs, and family-therapy sessions, their participation was "very inconsistent," and they had a history of relapsing into drug use, especially after heated arguments between them. For instance, they had both missed several urinalysis tests, including Mother's missed test a week before trial and Father's missed test in May 2006. The testimony also revealed that when Father was under the influence of drugs, he often got violent and out of control and subjected Mother to physical and psychological abuse. Although Mother had obtained a temporary restraining order (TRO) against Father after a particularly abusive incident, she let the TRO lapse and six months later, announced that she was engaged to marry Father.

Ultimately, the family court entered the August 14, 2006 Orders that determined, based on the clear and convincing evidence adduced at trial, that Parents were not presently willing and able (and it was not reasonably foreseeable that they would become willing and able) to provide Children with a safe family home, even with the assistance of a service plan, within a reasonable period of time, and that the permanent plan was in Children's best interest. Accordingly, the family court ordered the divestiture of Mother's parental duties and rights in Children and Father's parental duties and rights in Sons.

28. Mother filed notices of appeal from the following orders that were entered by the family court on August 14, 2006:(1) the order awarding permanent custody of L.A., and (2) the order awarding permanent custody of J.A. Mother did

Mother and Father timely filed their respective notices of appeal from the August 14, 2006 Orders entered in Cases 1 and 2, and their appeals were consolidated on November 29, 2006.

### MOTHER'S APPEAL

In her appeal,[28] Mother contends that (1) the evidence was insufficient to prove by clear and convincing evidence that she was presently unable to provide a safe home for Children; (2) DHS failed to make reasonable efforts to reunify her with Children; and (3) the permanent plan approved by the family court for Children is not in their best interest. Mother also challenges various findings of fact and conclusions of law entered by the family court that relate to her points on appeal.

According to the Hawai'i Supreme Court, "the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal." *In re Doe*, 101 Hawai'i 220, 227, 65 P.3d 167, 174 (2003) (brackets and internal quotation marks omitted). Moreover, in appeals concerning family-court decisions to terminate parental rights,

> the question on appeal is whether the record contains "substantial evidence" supporting the family court's determinations [pursuant to HRS § 587-73(a) ], and appellate review is thereby limited to assessing whether those determinations are supported by "credible evidence of sufficient quality and probative value." In this regard, the testimony of a single witness, if found by the trier of fact to have been credible, will suffice.

*In re Jane Doe, Born on June 20, 1995*, 95 Hawai'i 183, 196, 20 P.3d 616, 629 (2001) (citations omitted). Additionally, the supreme court has stated that

not file a notice of appeal from the order awarding permanent custody of Triplets, but since she has challenged this order in her opening brief, we will address her arguments.

[t]he family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Under the abuse of discretion standard of review, the family court's decision will not be disturbed unless the family court disregarded rules of principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

*In re Doe,* 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994) (citations, brackets, quotation marks, and ellipsis omitted).

■ Based on our careful review of the record on appeal, in light of the foregoing standards of review, and having duly considered the issues and arguments raised by Mother, as well as the statutory and case law relevant to these issues, we conclude that there is substantial evidence in the record to support the family court's orders as to Mother. Accordingly, we affirm the family court's orders as to Mother.

## FATHER'S APPEAL

In his appeal,[29] Father argues that (1) because he is a Native Hawaiian, the family court should have applied the beyond-a-reasonable-doubt-proof standard applicable to the termination of parental rights of native Americans under the Indian Child Welfare Act (ICWA), 25 United States Code (U.S.C.) § 1912(f) (2008);[30] (2) the family court abused its discretion and was clearly erroneous in finding and concluding that it was not reasonably foreseeable that he will become willing and able to provide Sons with a safe family home, even with the assistance of a service plan, within a reasonable period of time; and (3) he was denied due process of law because he was not provided the assistance of court-appointed counsel until sixteen days before trial. Father also challenges a number of the family court's findings of fact and conclusions of law that are related to his points on appeal.

■ Father's first argument has no merit. The ICWA clearly does not include Native Hawaiians within its purview and applies only to state-child-protective proceedings involving an "Indian child."[31] 25 United States Code Annotated (U.S.C.A.) §§ 1901, 1912. There was absolutely no evidence that L.A. or J.A. qualified as an "Indian child." Therefore, the beyond-a-reasonable-doubt standard for termination-of-parental-rights proceedings under the ICWA was clearly not applicable to Father.

We need not address Father's second argument because we agree with Father that his right to due process was violated when he was not afforded counsel until sixteen days prior to the permanent custody trial.

## DISCUSSION

### I.

The Hawai'i Supreme Court has affirmed that "independent of the federal constitution, ... parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause

---

**29.** Father appeals the following orders entered by the family court on August 14, 2006:(1) the order awarding permanent custody of L.A., and (2) the order awarding permanent custody of J.A.

**30.** 25 U.S.C. § 1912(f) currently provides, as it did during the proceedings below, as follows:
Pending court proceedings.
(f) Parental rights termination orders; evidence; determination of damage to child
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

**31.** The term "Indian child" means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C.A. § 1903(4).

An "Indian tribe" means "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians, including any Alaska Native village as defined in section 1602(c) of title 43." *Id.* at § 1903(8). An "Indian" is "any person who is a member of an Indian tribe, or who is an Alaska Native and a member of a Regional Corporation as defined in Section 1606 of Title 43." *Id.* at § 1903(3).

of article 1, section 5 of the Hawaiʻi Constitution." *In re Doe*, 99 Hawaiʻi 522, 533, 57 P.3d 447, 458 (2002) (footnote omitted). This right, the supreme court stated,

> would mean little if parents were deprived of the custody of their children without a fair hearing. Indeed, parents have a fundamental interest in the care, custody, and management of their children and the state may not deprive a person of his or her liberty interest without providing a fair procedure for the deprivation.

*Id.* (brackets and internal quotation marks omitted).

At issue in this case is the scope of the State's obligation to ensure a fair and just proceeding when it seeks to permanently remove a child from a parent. In a dissenting opinion in *Lassiter v. Dep't of Soc. Serv. of Durham County, N.C.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640, *reh'g denied*, 453 U.S. 927, 102 S.Ct. 889, 69 L.Ed.2d 1023 (1981), Justice Blackmun eloquently described what is at stake in cases such as this, which appear with demoralizing frequency on the calendars of our family and appellate courts:

> At stake here is the interest of a parent in the companionship, care, custody, and management of his or her children. This interest occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. Far more precious ... than property rights, parental rights have been deemed to be among those essential to the orderly pursuit of happiness by free men, and to be more significant and priceless than liberties which derive merely from shifting economic arrangements. Accordingly, although the Constitution is verbally silent on the specific subject of families, freedom of personal choice in matters of family life long has been viewed as a fundamental liberty interest worthy of protection under the Fourteenth Amendment. Within the general ambit of family integrity, the Court has accorded a high degree of constitutional respect to a natural parent's interest both in controlling the details of the child's upbringing, and in retaining the custody and companionship of the child[.]

> In this case, the State's aim is not simply to influence the parent-child relationship but to *extinguish* it. A termination of parental rights is both total and irrevocable. Unlike other custody proceedings, it leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development. It is hardly surprising that this forced dissolution of the parent-child relationship has been recognized as a punitive sanction by courts, Congress, and commentators. The Court candidly notes, as it must, that termination of parental rights by the State is a unique kind of deprivation.

> The magnitude of this deprivation is of critical significance in the due process calculus, for the process to which an individual is entitled is in part determined by the extent to which he may be condemned to suffer grievous loss. Surely there can be few losses more grievous than the abrogation of parental rights.

*Lassiter*, 452 U.S. at 38–40, 101 S.Ct. 2153 (quotation marks, brackets, and citations omitted).

■■■ In Hawaiʻi, an individual charged with an offense that is punishable by even one day in jail has a constitutional[32] and statutory[33] right to be represented by coun-

---

32. Article I, section 14 of the Hawaii Constitution provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for the accused's defense.... The State shall provide counsel for an indigent defendant charged with an offense punishable by imprisonment."

33. HRS § 802–1 (1993) provides, in pertinent part:

> Right to representation by public defender or other appointed counsel. Any indigent person who is (1) *arrested for, charged with or convicted of an offense or offenses punishable by confinement in jail or prison* ... shall be entitled to be represented by a public defender. If, however, conflicting interests exist, or if the public defender for any other reason is unable to act, or if the interests of justice require, the court may appoint other counsel.

> (Emphasis added.)

sel, to be advised of that right, and, if indigent, to have counsel appointed to represent him or her. *State v. Dowler,* 80 Hawai'i 246, 909 P.2d 574 (App.1995), *cert. dismissed as improvidently granted,* 80 Hawai'i 357, 910 P.2d 128 (1996). Therefore, in contrast to an indigent criminal defendant in the federal courts who is entitled to be represented by counsel only if he or she is *actually sentenced* to imprisonment, *Scott v. Illinois,*[34] 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979), an indigent criminal defendant in the Hawai'i courts is entitled to the guiding hand of counsel as soon as he or she is charged with an offense for which the defendant, if convicted, *may* be punished by imprisonment.

■ "The right of a parent to [his or her] child [is] more precious to many people than the right of life itself." *In re Luscier,* 84 Wash.2d 135, 524 P.2d 906, 908 (1974). Indeed, it has been recognized that "[t]he permanent termination of parental rights is one of the most drastic actions the state can take against its inhabitants." *State v. Jamison,* 251 Or. 114, 444 P.2d 15, 17 (1968), overruled by *State v. Geist,* 310 Or. 176, 796 P.2d 1193 (1990). Despite the magnitude of the deprivation faced by an indigent parent in a child-protective proceeding, appointment of counsel for an indigent parent who is a party to a child-protective proceeding remains discretionary in Hawai'i:

> Guardian ad litem; court appointed counsel. (a) The court shall appoint a guardian ad litem for the child to serve throughout the pendency of the child protective proceedings under this chapter. *The court may appoint* additional counsel for the child pursuant to subsection (c) or *independent counsel for any other party if the party is an indigent, counsel is necessary to protect the party's interests adequately, and the interests are not repre-*

> *sented adequately by another party who is represented by counsel.*

> . . . .

> (e) A guardian ad litem or counsel appointed pursuant to this section for the child or other party may be paid for by the court, unless the party for whom counsel is appointed has an independent estate sufficient to pay such costs. The court may order the appropriate parties to pay or reimburse the costs and fees of the guardian ad litem and other counsel appointed for the child.

HRS § 587–34 (2006). Hawai'i thus remains one of only a handful of states that does not, by statute or case law, guarantee indigent parents a right to appointed counsel, at least at the stage of a child-protective proceeding at which parents are threatened with the prolonged and/or indefinite deprivation of custody of their children. *See* Rosalie R. Young, *The Right to Appointed Counsel in Termination of Parental Rights Proceedings: The States' Response to Lassiter,* 14 Touro L.Rev. 247, 276–81 (1997);[35] *Watson v. Division of Family Services,* 813 A.2d 1101, 1107–08 (Del.2002).

Prior to 1981, the overwhelming majority of state and federal courts that had addressed the issue held that constitutional due process required that indigent parents be provided with court-appointed counsel in termination-of-parental-rights and prolonged-deprivation-of-custody cases. *See, e.g., Davis v. Page,* 640 F.2d 599, 604 (5th Cir.1981) (holding that "in a formal adjudication of dependency under Florida law, where prolonged or indefinite deprivation of parental custody is threatened, due process requires that an indigent parent be offered counsel and that counsel be provided unless a knowing and intelligent waiver is made"), *vacated on other grounds by Chastain v. Davis,* 458 U.S. 1118, 102 S.Ct. 3504, 73 L.Ed.2d 1380 (1982); *Smith v. Edmiston,* 431 F.Supp. 941,

---

**34.** In *Scott v. Illinois,* the United States Supreme Court held that an indigent criminal defendant charged with an offense punishable by imprisonment is not entitled to court-appointed counsel under the Sixth and Fourteenth Amendments to the United States Constitution if the defendant is merely fined and not actually imprisoned. 440 U.S. at 374, 99 S.Ct. 1158.

**35.** According to Rosalie R. Young's article in 14 Touro L.Rev., in only five states (Delaware, Hawai'i, South Carolina, Tennessee, and Wyoming) is the appointment of counsel for indigent parents in termination-of-parental-rights proceedings left to the discretion of the trial court. 14 Touro L.Rev. at 259.

945 (W.D.Tenn.1977) (holding that "the due process clause requires that parents in dependency and neglect proceedings be advised of their right to be assisted by counsel and if they cannot afford counsel that counsel be appointed for them unless they knowingly waive their right to counsel"); *In re D.B. and D.S.*, 385 So.2d 83, 90–91 (Fla.1980) (holding that "in proceedings involving the permanent termination of parental rights to a child, or when the proceedings, because of their nature, may lead to criminal child abuse charges" indigent parents must be provided counsel under the due-process clause of the United States and Florida constitutions, but "where there is no threat of permanent termination of parental custody, the test [for determining the right to court-appointed counsel] should be applied on a case-by-case basis"); *In re Cooper*, 230 Kan. 57, 631 P.2d 632, 635 & 641 (1981) (holding that "[w]hen there is a permanent deprivation or severance of parental rights both the statute . . . and the case law . . . require that the natural parent or parents be represented by counsel at the hearing [and i]f the parent is financially unable to employ counsel the court must assign counsel to the parent at the expense of the county[,]" but in a "deprived child" hearing to temporarily remove children from the family with a view to giving them care, guidance, and discipline, due process requires that counsel be appointed for indigent parents "where the conditions outlined prior to the hearing appear to be serious and have remained so for a considerable time[.]"), *superseded by statute as stated in In re J.A.H.*, 285 Kan. 375, 172 P.3d 1 (2007);[36] *Danforth v. State Dep't of Health & Welfare*, 303 A.2d 794, 795 (Me.1973) (holding that the United States and Maine constitutions compel the conclusion that "an indigent parent or parents against whom a custody petition is instituted . . . is entitled to have counsel appointed at the State's expense unless the right to counsel is knowingly waived"); *Crist v. Div. of Youth & Family Servs.*, 128 N.J.Super. 402, 320 A.2d 203, 211 (1974) (holding that

prospectively, "indigent parents subjected to dependency proceedings looking towards temporary custody or permanent termination of parental rights are entitled to counsel free of charge" and that "[s]ince the proceeding for temporary custody is frequently a prelude to a petition to terminate parental rights, or failure in a temporary custody proceeding may permanently discourage further interest in a final termination proceeding, there is equal justification for legal representation at the earlier, temporary state of the proceeding"), *affirmed in part and reversed in part on other grounds by*, 135 N.J.Super. 573, 343 A.2d 815 (1975); *In re Ella R.B.*, 30 N.Y.2d 352, 334 N.Y.S.2d 133, 285 N.E.2d 288, 290 (1972) (holding that "an indigent parent, faced with the loss of a child's society, as well as the possibility of criminal charges, is entitled to the assistance of counsel"; "[a] parent's concern for the liberty of the child, as well as for his care and control, involves too fundamental an interest and right to be relinquished to the State without the opportunity for a hearing, with assigned counsel if the parent lacks the means to retain a lawyer"; and since a right to counsel exists, "it follows that one is entitled to be so advised"); *State v. Jamison*, 251 Or. 114, 444 P.2d 15, 17 (1968) (holding that "[i]t would be unconscionable for the state forever to terminate the parental rights of the poor without allowing such parents to be assisted by counsel"; counsel in juvenile court must be made available for parents and children alike when the relationship of parent and child is threatened by the state; "[i]f the parents are too poor to employ counsel, the cost thereof must be borne by the public"; and waiver of the right to counsel "cannot be inferred from a failure to request court-appointed counsel by a person who, insofar as the record reveals, does not know of her right to counsel"), *overruled by State v. Geist*, 310 Or. 176, 796 P.2d 1193 (1990) (holding that the United States Supreme Court's decision in *Lassiter* overruled the

---

**36.** In *In re J.A.H.*, the Kansas Supreme Court pointed out that in 1982, less than one year after *In re Cooper* was decided, the Kansas Legislature adopted the Code of Care of Children, which "specifically provided for the appointment of counsel to indigent parents in [child-in-need-of-

care] proceedings." The court held, that "[b]ecause the statute requires the appointment of counsel to indigent parents, the factor-focused analysis arising out of *Cooper* is no longer necessary." 72 P.3d at 7.

holding in *Jamison* that due process requires the appointment of counsel in every termination-of-parental-rights case); *In re Adoption of R.I.*, 455 Pa. 29, 312 A.2d 601, 602 (1973) (explaining that the logic behind the right to court-appointed counsel in criminal cases "is equally applicable to a case involving an indigent parent faced with the loss of [his or] her child"); *In re Welfare of Luscier*, 84 Wash.2d 135, 524 P.2d 906 (1974) (holding that a parent's right to counsel at public expense in a permanent-child-deprivation proceeding "is mandated by the constitutional guarantees of due process under the Fourteenth Amendment of the United States Constitution and Art. 1, § 3 of the Washington Constitution"); *In re Welfare of Myricks*, 85 Wash.2d 252, 533 P.2d 841 (1975) (extending the right of indigent parents to court-appointed counsel in permanent child deprivation proceedings to temporary deprivation proceedings "where permanent deprivation may likely follow the dependency and child neglect proceeding"); *State ex rel. Lemaster v. Oakley*, 157 W.Va. 590, 203 S.E.2d 140, 145 (1974) (concluding that "[c]onsidering the complexity of charges potentially directed to allegedly neglectful parents, the sources available to the State as charging party, the potential for the State viewing the parents' defensive testimony as probative of criminal conduct and the fundamental nature of the parents' rights to the care, custody and companionship of their natural children, we are impelled to hold that a minimum standard of due process requires indigent parents faced with charges of neglect and the potential for termination of parental rights to natural children to be furnished with court-appointed counsel to represent their interest at State expense. The vast majority of reviewing courts of our sister and federal jurisdictions have adopted the precise view which we adopt today."). *See also* Annotation, *Right of Indigent Parent to Appointed Counsel in Proceeding for Involuntary Termination of Parental Rights*, 92 A.L.R.5th 379 (2007).

In 1981, however, the United States Supreme Court, in a five-to-four decision, rejected the prevailing case law and held that under the Due Process Clause of the Fourteenth Amendment of the United States Constitution,[37] indigent parents in a state-initiated termination-of-parental-rights proceeding do not have a *per se* right to be represented by court-appointed counsel. *Lassiter*, 452 U.S. at 31–32, 101 S.Ct. 2153. In coming to this conclusion, Justice Stewart, writing for the majority, initially examined relevant Supreme Court precedents on an indigent's right to appointed counsel and observed that "[t]he pre-eminent generalization that emerges from this Court's precedents ... is that such a right has been recognized to exist only where the litigant may lose his [or her] physical liberty if he [or she] loses the litigation." *Id.* at 25, 101 S.Ct. 2153. The majority noted that "it is the defendant's interest in personal freedom, and not simply the special Sixth and Fourteenth Amendments [sic] right to counsel in criminal cases, which triggers the right to appointed counsel[,]" and that "as a litigant's interest in personal liberty diminishes, so does his right to appointed counsel." *Id.* at 25–26, 101 S.Ct. 2153.

Summarizing its precedents, the majority stated:

> [T]he Court's precedents speak with one voice about what "fundamental fairness" has meant when the Court has considered the right to appointed counsel, and we thus draw from them the presumption that an indigent litigant has a right to appointed counsel only when, if he [or she] loses, he [or she] may be deprived of his [or her] physical liberty. It is against this presumption that all the other elements in the due process decision must be measured.

452 U.S. at 26–27, 101 S.Ct. 2153.

The majority then explained that these "other elements" are those delineated in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In *Eldridge*, the Supreme Court set forth three factors to consider in weighing what due process requires: "[ (1) ] the private interests at stake, [ (2) ] the government's interest, and [ (3) ] the risk that the procedures used will lead to erroneous decisions." *Eldridge*, 424 U.S. at

---

**37.** The Fourteenth Amendment to the United States Constitution provides in part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]"

335, 96 S.Ct. 893. Discussing these factors in the context of termination-of-parental-rights proceedings, the majority noted:

This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to the companionship, care, custody and management of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection. Here the State has sought not simply to infringe upon that interest but to end it. If the State prevails, it will have worked a unique kind of deprivation. A parent's interest in the accuracy and injustice of the decision to terminate his or her parental status is, therefore, a commanding one.[3]

Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision. For this reason, the State may share the indigent parent's interest in the availability of appointed counsel. If, as our adversary system presupposes, accurate and just results are most likely to be obtained through the equal contest of opposed interests, the State's interests in the child's welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal. North Carolina itself acknowledges as much by providing that where a parent files a written answer to a termination petition, the State must supply a lawyer to represent the child. N.C. Gen.Stat. § 7A–289.29 (Supp.1979).

The State's interests, however, clearly diverge from the parent's insofar as the State wishes the termination decision to be made as economically as possible and thus wants to avoid both the expense of appointed counsel and the cost of the lengthened proceedings his [or her] presence may cause. But though the State's pecuniary interest is legitimate, it is hardly significant enough to overcome private interests as important as those here, particularly in light of the concession in the respondent's brief that the "potential costs of appointed counsel in termination proceedings ... is [sic] admittedly *de minimis* compared to the costs in all criminal actions."

Finally, consideration must be given to the risk that a parent will be erroneously deprived of his or her child because the parent is not represented by counsel....

....

[T]he ultimate issues with which a termination hearing deals are not always simple, however commonplace they may be. Expert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented. The parents are likely to be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation. That these factors may combine to overwhelm an uncounseled parent is evident from the findings some courts have made. Thus, courts have generally held that the State must appoint counsel for indigent parents at termination proceedings.[6] The respondent is able to point to no presently authoritative case, except for the North Carolina judgment now before us, holding that an indigent parent has no due process right to appointed counsel in termination proceedings.

---

[3] Some parents will have an additional interest to protect. Petitions to terminate parental rights are not uncommonly based on alleged criminal activity. Parents so accused may need legal counsel to guide them in understanding the problems such petitions may create.

....

[6] A number of courts have held that indigent parents have a right to appointed counsel in child dependency or neglect hearings as well. *E.g., Davis v. Page,* 640 F.2d 599 (C.A.5 1981) (en banc); *Cleaver v. Wilcox,* 499 F.2d 940 (C.A.9 1974) (right to be decided case by case); *Smith v. Edmiston,* 431 F.Supp. 941 (W.D.Tenn.1977).

452 U.S. at 27–30, 101 S.Ct. 2153 (some citations, quotation marks, and footnotes omitted).

The Supreme Court majority then held that since each case may present a different weighing of the *Eldridge* factors and "due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed," *id.* at 32, 96 S.Ct. 893 (quoting *Gagnon v. Scarpelli*, 411 U.S. 778, 788, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973)), the question of whether indigent parents faced with termination of their parental rights are entitled to appointed counsel must be "answered in the first instance by the trial court, subject, of course to appellate review." *Id.* The majority thus adopted a case-by-case approach to determining the right to counsel in such proceedings.

Applying the case-by-case balancing test to the facts and circumstances of the *Lassiter* case,[38] the Supreme Court majority concluded that the trial court did not err in failing to appoint counsel for the appellant because

the petition to terminate [appellant's] parental rights contained no allegations of neglect or abuse upon which criminal charges could be based, ... no expert witnesses testified[,] and the case presented no specially troublesome points of law, either procedural or substantive. While hearsay evidence was no doubt admitted, and while [appellant] no doubt left incomplete her defense that the Department had not adequately assisted her in rekindling her interest in her son, the weight of the evidence that she had few sparks of such interest was sufficiently great that the presence of counsel for [appellant] could not have made a determinative difference.... Finally, a court deciding whether due process requires the appointment of

counsel need not ignore a parent's plain demonstration that [he or] she is not interested in attending a hearing. Here, the trial court had previously found that [appellant] had expressly declined to appear at the 1975 child custody hearing, [appellant] had not even bothered to speak to her retained lawyer after being notified of the termination hearing, and the court specifically found that [appellant's] failure to make an effort to contest the termination proceeding was without cause. In view of all these circumstances, we hold that the trial court did not err in failing to appoint counsel for [appellant].

452 U.S. at 32–33, 101 S.Ct. 2153 (footnote omitted).

The majority concluded by noting that the standards imposed on the state in *Lassiter* constitute the constitutional floor with respect to due-process standards. "A wise public policy," the majority explained, "may require that higher standards be adopted than those minimally tolerable under the Constitution." *Id.* at 33, 101 S.Ct. 2153. Indeed, the majority continued,

[i]nformed public opinion has clearly come to hold that an indigent parent is entitled to the assistance of appointed counsel not only in parental termination proceedings, but also in dependency and neglect proceedings as well. Most significantly, 33 States and the District of Columbia provide statutorily for the appointment of counsel in termination cases. The Court's opinion today in no way implies that the standards increasingly urged by informed public opinion and now widely followed by the States are other than enlightened and wise.

38. *Lassiter*, 452 U.S. 18, 101 S.Ct. 2153 (1981), involved a mother, Abby Gail Lassiter (Lassiter), whose infant son was adjudicated by a district court in North Carolina in 1975 to be a neglected child and then transferred to the custody of the Durham County Department of Social Services (DCDSS). In 1976, Lassiter was convicted of second-degree murder and began serving a sentence of twenty-five to forty years of imprisonment. In 1978, DCDSS petitioned to terminate Lassiter's parental rights on grounds that Lassiter had not had any contact with her child since December 1975 and "has willfully left the child in foster care for more than two consecutive years without showing that substantial progress

has been made in correcting the conditions which led to the removal of the child, or without showing a positive response to the diligent efforts of the [DCDSS] to strengthen her relationship to the child, or to make and follow through with constructive planning for the future of the child." Lassiter was served with the petition and the notice of the hearing on the petition. Although she had retained counsel to attempt to invalidate the murder conviction, she did not mention the forthcoming hearing to her counsel. Lassiter was brought from the prison to the hearing and acted as her own attorney. 452 U.S. at 20, 101 S.Ct. 2153.

*Id.* at 33–34, 101 S.Ct. 2153 (citations omitted).

## II.

In a passionate dissenting opinion joined by Justices Brennan and Marshall, Justice Blackmun disagreed that the unique importance of a parent's interest in the care and custody of his or her child can be constitutionally extinguished through formal judicial proceedings without the benefit of counsel. *Id.* at 57–58, 101 S.Ct. 2153 (Blackmun, J., dissenting). Justice Blackmun rejected the distinction drawn by the majority between the State depriving a person of his or her physical liberty and the State depriving a person of a child:

### A

. . . .

I do not believe that our cases support the "presumption" asserted, that physical confinement is the only loss of liberty grievous enough to trigger a right to appointed counsel under the Due Process Clause. Indeed, incarceration has been found to be neither a necessary nor a sufficient condition for requiring counsel on behalf of an indigent defendant. The prospect of canceled parole or probation, with its consequent deprivation of personal liberty, has not led the Court to require counsel for a prisoner facing a revocation proceeding. On the other hand, the fact that no new incarceration was threatened by a transfer from prison to a mental hospital did not preclude the Court's recognition of adverse changes in the conditions of confinement and of the stigma that presumably is associated with being labeled mentally ill. For four Members of the Court, these "other deprivations of liberty," coupled with the possibly diminished mental capacity of the prisoner, compelled the provision of counsel for any indigent prisoner facing a transfer hearing.

Moreover, the Court's recourse to a "pre-eminent generalization," misrepresents the importance of our flexible approach to due process. That approach consistently has emphasized attentiveness to the particular context. Once an individual interest is deemed sufficiently substantial or fundamental, determining the constitutional necessity of a requested procedural protection requires that we examine the nature of the proceeding—both the risk of error if the protection is not provided and the burdens created by its imposition.[8]

Rather than opting for the insensitive presumption that incarceration is the only loss of liberty sufficiently onerous to justify a right to appointed counsel, I would abide by the Court's enduring commitment to examine the relationships among the interests on both sides, and the appropriateness of counsel in the specific type of proceeding. The fundamental significance of the liberty interest at stake in a parental termination proceeding is undeniable, and I would find this first portion of the due process balance weighing heavily in favor of refined procedural protections. The second *Eldridge* factor, namely, the risk of error in the procedure provided by the State, must then be reviewed with some care.

### B

The method chosen by North Carolina to extinguish parental rights resembles in many respects a criminal prosecution. Unlike the probation revocation procedure reviewed in *Gagnon v. Scarpelli,* on which the Court so heavily relies, the termination procedure is distinctly formal and adversarial. The State initiates the proceeding by filing a petition in district court, and serving a summons on the parent[.] A state judge presides over the adjudicatory hearing that follows, and the hearing is conducted pursuant to the formal rules of evidence and procedure. In general, hearsay is inadmissible and records must be authenticated.

In addition, the proceeding has an obvious accusatory and punitive focus. In moving to terminate a parent's rights, the State has concluded that it no longer will try to preserve the family unit, but instead will marshal an array of public resources to establish that the parent-child separation must be made permanent.[10] The

State has legal representation through the county attorney. This lawyer has access to public records concerning the family and to professional social workers who are empowered to investigate the family situation and to testify against the parent. The State's legal representative may also call upon experts in family relations, psychology, and medicine to bolster the State's case. And, of course, the State's counsel himself is an expert in the legal standards and techniques employed at the termination proceeding, including the methods of cross-examination.

In each of these respects, the procedure devised by the State vastly differs from the informal and rehabilitative probation revocation decision in *Scarpelli*, the brief, educative school disciplinary procedure in *Goss* [*v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)], and the essentially medical decision in *Parham* [*v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)]. Indeed, the State here has prescribed virtually all the attributes of a formal trial as befits the severity of the loss at stake in the termination decision—every attribute, that is, except counsel for the defendant parent. The provision of counsel for the parent would not alter the character of the proceeding, which is already adversarial, formal, and quintessentially legal. It, however, would diminish the prospect of an erroneous termination, a prospect that is inherently substantial, given the gross disparity in power and resources between the State and the uncounseled indigent parent.

The prospect of error is enhanced in light of the legal standard against which the defendant parent is judged. As demonstrated here, that standard commonly adds another dimension to the complexity of the termination proceeding. Rather than focusing on the facts of isolated acts or omissions, the State's charges typically address the nature and quality of complicated ongoing relationships among parent, child, other relatives, and even unrelated parties. In the case at bar, the State's petition accused petitioner of two of the several grounds authorizing termination of parental rights under North Carolina law:

"That [petitioner] has *without cause,* failed to establish or maintain *concern or responsibility* as to the child's welfare[";](; and]

"That [petitioner] has *willfully* left the child in foster care for more than two consecutive years without showing that *substantial progress has been made* in correcting the conditions which led to the removal of the child [for neglect], or without showing a *positive response* to the *diligent efforts of the Department of Social Services* to strengthen her relationship to the child, or *to make and follow through with constructive planning* for the future of the child." (Emphasis supplied.) Juvenile Petition ¶¶ 6, 7, App. 3.

The legal issues posed by the State's petition are neither simple nor easily defined. The standard is imprecise and open to the subjective values of the judge.[13] A parent seeking to prevail against the State must be prepared to adduce evidence about his or her personal abilities and lack of fault, as well as proof of progress and foresight as a parent that the State would deem adequate and improved over the situation underlying a previous adverse judgment of child neglect. The parent cannot possibly succeed without being able to identify material issues, develop defenses, gather and present sufficient supporting nonhearsay evidence, and conduct cross-examination of adverse witnesses.

The Court, of course, acknowledges, that these tasks "may combine to overwhelm an uncounseled parent." I submit that that is a profound understatement. Faced with a formal accusatory adjudication, with an adversary—the State—that commands great investigative and prosecutorial resources, with standards that involve ill-defined notions of fault and adequate parenting, and with the inevitable tendency of a court to apply subjective values or to defer to the State's "expertise," the defendant parent plainly is outstripped if he or she is without the assistance of "the guiding hand of counsel." When the parent is indigent, lacking in education, and easily intimidated

by figures of authority,[14] the imbalance may well become insuperable.

The risk of error thus is severalfold. The parent who actually has achieved the improvement or quality of parenting the State would require may be unable to establish this fact. The parent who has failed in these regards may be unable to demonstrate cause, absence of willfulness, or lack of agency diligence as justification. And errors of fact or law in the State's case may go unchallenged and uncorrected. Given the weight of the interests at stake, this risk of error assumes extraordinary proportions. By intimidation, inarticulateness, or confusion, a parent can lose forever all contact and involvement with his or her offspring.

### C

The final factor to be considered, the interests claimed for the State, do not tip the scale against providing appointed counsel in this context. The State hardly is in a position to assert here that it seeks the informality of a rehabilitative or educative proceeding into which counsel for the parent would inject an unwelcome adversarial edge. As the Assistant Attorney General of North Carolina declared before this Court, once the State moves for termination, it "has made a decision that the child cannot go home and should not go home. It no longer has an obligation to try and restore that family."

The State may, and does, properly assert a legitimate interest in promoting the physical and emotional well-being of its minor children. But this interest is not served by terminating the rights of any concerned, responsible parent. Indeed, because North Carolina is committed to "protect[ing] all children from the unnecessary severance of a relationship with biological or legal parents," "the State spites its own articulated goals when it needlessly separates" the parent from the child.

The State also has an interest in avoiding the cost and administrative inconvenience that might accompany a right to appointed counsel. But, as the Court acknowledges, the State's fiscal interest "is hardly significant enough to overcome private interests as important as those here." The State's financial concern indeed is a limited one, for the right to appointed counsel may well be restricted to those termination proceedings that are instituted by the State. Moreover, no difficult line-drawing problem would arise with respect to other types of civil proceedings. The instant due process analysis takes full account of the fundamental nature of the parental interest, the permanency of the threatened deprivation, the gross imbalance between the resources employed by the prosecuting State and those available to the indigent parent, and the relatively insubstantial cost of furnishing counsel. An absence of any one of these factors might yield a different result. But where, as here, the threatened loss of liberty is severe and absolute, the State's role is so clearly adversarial and punitive, and the cost involved is relatively slight, there is no sound basis for refusing to recognize the right to counsel as a requisite of due process in a proceeding initiated by the State to terminate parental rights.

---

[8] By emphasizing the value of physical liberty to the exclusion of all other fundamental interests, the Court today grants an unnecessary and burdensome new layer of analysis onto its traditional three-factor balancing test. Apart from improperly conflating two distinct lines of prior cases, the Court's reliance on a "rebuttable presumption" sets a dangerous precedent that may undermine objective judicial review regarding other procedural protections. Even in the area of juvenile court delinquency proceedings, where the threat of incarceration arguably supports an automatic analogy to the criminal process, the Court has eschewed a bright-line approach. Instead, it has evaluated each requested procedural protection in light of its consequences for fair play and truth determination.

. . . .

[10] Significantly, the parent's rights and interests are not mentioned at all under the statement of purpose for the North

**54**

Carolina termination statute. In contrast, in abuse, neglect, and dependency proceedings the State has a statutory obligation to keep a family together whenever possible. Thus, the State has chosen to provide counsel for parents, in circumstances where it shares at least in part their interest in family integrity but not where it regards the parent as an opponent. The Assistant Attorney General of North Carolina explained the decision to furnish appointed counsel at the abuse and neglect stage by pointing to the State's need to avoid an awkward situation, given its possibly conflicting responsibilities to parent and child. While this may be sound as a matter of public policy, it cannot excuse the failure to provide counsel at the termination stage, where the State and the indigent parent are adversaries, and the inequality of power and resources is starkly evident....

. . . .

[13] Under North Carolina law, there is a further stage to the termination inquiry. Should the trial court determine that one or more of the conditions authorizing termination has been established, it then must consider whether the best interests of the child require maintenance of the parent-child relationship.

This Court more than once has adverted to the fact that the "best interests of the child" standard offers little guidance to judges, and may effectively encourage them to rely on their own personal values. Several courts, perceiving similar risks, have gone so far as to invalidate parental termination statutes on vagueness grounds.

[14] See Schetky, Angell, Morrison, & Sack, Parents Who Fail: A Study of 51 Cases of Termination of Parental Rights, 18 J. Am. Acad. Child Psych. 366, 375 (1979) (citing minimal educational backgrounds). See also *Davis v. Page*, 442 F.Supp. 258, 260 (S.D.Fla.1977) (uncounseled parent, ignorant of governing substantive law, "was little more than a spectator in the adjudicatory [dependency] proceeding," and "sat silently through most of the hearing . . . fearful of antagon-

izing the social workers"), aff'd in part, 640 F.2d 599 (C.A.5 1981) (en banc).

452 U.S. at 38–48, 101 S.Ct. 2153 (some footnotes, quotation marks, and citations omitted; emphasis in original).

Justice Blackmun also decried the majority's case-by-case approach to determining whether due process required appointment of counsel in a termination of parental rights case:

**A**

The Court's analysis is markedly similar to mine; it, too, analyzes the three factors listed in *Mathews v. Eldridge*, and it, too, finds the private interest weighty, the procedure devised by the State fraught with risks of error, and the countervailing governmental interest insubstantial. Yet, rather than follow this balancing process to its logical conclusion, the Court abruptly pulls back and announces that a defendant parent must await a case-by-case determination of his or her need for counsel. Because the three factors will not *always* be so distributed, reasons the Court, the Constitution should not be read to "requir[e] the appointment of counsel in *every* parental termination proceeding." ([E]mphasis added[.]) This conclusion is not only illogical, but it also marks a sharp departure from the due process analysis consistently applied heretofore. The flexibility of due process, the Court has held, requires case-by-case consideration of different decision-making *contexts*, not of different *litigants* within a given context. In analyzing the nature of the private and governmental interests at stake, along with the risk of error, the Court in the past has not limited itself to the particular case at hand. Instead, after addressing the three factors as generic elements in the context raised by the particular case, the Court then has formulated a rule that has general application to similarly situated cases.

. . . .

There are sound reasons for this. Procedural norms are devised to ensure that justice may be done in every case, and to protect litigants against unpredictable and unchecked adverse governmental action.

Through experience with decisions in varied situations over time, lessons emerge that reflect a general understanding as to what is minimally necessary to assure fair play. Such lessons are best expressed to have general application which guarantees the predictability and uniformity that underlie our society's commitment to the rule of law. By endorsing, instead, a retrospective review of the trial record of each particular defendant parent, the Court today undermines the very rationale on which this concept of general fairness is based.

Moreover, the case-by-case approach advanced by the Court itself entails serious dangers for the interests at stake and the general administration of justice. The Court assumes that a review of the record will establish whether a defendant, proceeding without counsel, has suffered an unfair disadvantage. But in the ordinary case, this simply is not so. The pleadings and transcript of an uncounseled termination proceeding at most will show the obvious blunders and omissions of the defendant parent. Determining the difference legal representation would have made becomes possible only through imagination, investigation, and legal research focused on the particular case. Even if the reviewing court can embark on such an enterprise in each case, it might be hard pressed to discern the significance of failures to challenge the State's evidence or to develop a satisfactory defense. Such failures, however, often cut to the essence of the fairness of the trial, and a court's inability to compensate for them effectively eviscerates the presumption of innocence. Because a parent acting *pro se* is even more likely to be unaware of controlling legal standards and practices, and unskilled in garnering relevant facts, it is difficult, if not impossible, to conclude that the typical case has been adequately presented.

Assuming that this ad hoc review were adequate to ensure fairness, it is likely to be both cumbersome and costly. And because such review involves constitutional rights implicated by state adjudications, it necessarily will result in increased federal interference in state proceedings. The Court's implication to the contrary is belied by the Court's experience in the aftermath of *Betts v. Brady* [316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942)]. The Court was confronted with innumerable post verdict challenges to the fairness of particular trials, and expended much energy in effect evaluating the performance of state judges. This level of intervention in the criminal processes of the States prompted Justice Frankfurter, · speaking for himself and two others, to complain that the Court was performing as a "super-legal-aid bureau." I fear that the decision today may transform the Court into a "super family court."

452 U.S. at 48–52, 101 S.Ct. 2153 (footnotes and some citations omitted).

Justice Blackmun then went on to describe how the problem of inadequate representation was "painfully apparent" in the *Lassiter* case. *Id.* at 52, 101 S.Ct. 2153. He acknowledged that the petitioner mother "ha[d] not led the life of the exemplary citizen or model parent" and that even if she had been "accorded competent legal representation," the ultimate result might have been the same. *Id.* at 57, 101 S.Ct. 2153. Justice Blackmun observed, however, that

the issue before the Court is not petitioner's character; it is whether she was given a meaningful opportunity to be heard when the State moved to terminate absolutely her parental rights. [I]n light of the unpursued avenues of defense, and of the experience petitioner underwent at the hearing, I find virtually incredible the Court's conclusion today that her termination proceeding was fundamentally fair. To reach that conclusion, the Court simply ignores the defendant's obvious inability to speak effectively for herself, a factor the Court has found to be highly significant in past cases. I am unable to ignore that factor; instead, I believe that the record, and the norms of fairness acknowledged by the majority, compel a holding according counsel to petitioner and persons similarly situated.

Finally, I deem it not a little ironic that the Court on this very day *grants*, on due

process grounds, an indigent putative father's claim for state-paid blood grouping tests in the interest of according him a meaningful opportunity to disprove his paternity, *Little v. Streater,* 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627, but in the present case *rejects,* on due process grounds, an indigent mother's claim for state-paid legal assistance when the State seeks to take her own child away from her in a termination proceeding. In *Little v. Streater,* the Court stresses and relies upon the need for "procedural fairness," the "compelling interest in the accuracy of [the] determination," the "not inconsiderable" risk of error, the indigent's fac[ing] the State as an adversary, and "fundamental fairness," 452 U.S., at 13, 14, and 16, 101 S.Ct., at 2209 and 2210.

There is some measure of inconsistency and tension here, it seems to me. I can attribute the distinction the Court draws only to a presumed difference between what it views as the "civil" and the quasi-criminal, *Little v. Streater,* 452 U.S., at 10, 101 S.Ct., at 2207. Given the factual context of the two cases decided today, the significance of that presumed difference eludes me.

Ours, supposedly, is "a maturing society," and our notion of due process is, "perhaps, the least frozen concept of our law." If the Court in *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), was able to perceive as constitutionally necessary the access to judicial resources required to dissolve a marriage at the behest of private parties, surely it should perceive as similarly necessary the requested access to legal resources when the State itself seeks to dissolve the intimate and personal family bonds between parent and child. It will not open the "floodgates" that, I suspect, the Court fears. On the contrary, we cannot constitutionally afford the closure that the result in this sad case imposes upon us all.

*Id.* at 57–59, 101 S.Ct. 2153 (footnotes and some citations omitted).

In a separate dissent to the majority opinion in *Lassiter,* Justice Stevens initially observed that a woman's misconduct may cause a state to either incarcerate the woman for a fixed term, a pure deprivation of liberty, or

permanently deprive her of her freedom to associate with her child, "a deprivation of both liberty and property, because statutory rights of inheritance as well as the natural relationship may be destroyed." *Id.* at 59, 101 S.Ct. 2153 (Stevens, J., dissenting). "Although both deprivations are serious," Justice Stevens stated, "often the deprivation of parental rights will be the more grievous of the two[,]" and "[t]he plain language of the Fourteenth Amendment commands that both deprivations must be accompanied by due process of law." Justice Stevens continued:

Without so stating explicitly, the Court appears to treat this case as though it merely involved the deprivation of an interest in property that is less worthy of protection than a person's liberty. The analysis employed in *Mathews v. Eldridge,* in which the Court balanced the costs and benefits of different procedural mechanisms for allocating a finite quantity of material resources among competing claimants, is an appropriate method of determining what process is due in property cases. Meeting the Court on its own terms, Justice BLACKMUN demonstrates that the *Mathews v. Eldridge* analysis requires the appointment of counsel in this type of case. I agree with his conclusion, but I would take one further step.

In my opinion the reasons supporting the conclusion that the Due Process Clause of the Fourteenth Amendment entitles the defendant in a criminal case to representation by counsel apply with equal force to a case of this kind. The issue is one of fundamental fairness, not of weighing the pecuniary costs against the societal benefits. Accordingly, even if the costs to the State were not relatively insignificant but rather were just as great as the costs of providing prosecutors, judges, and defense counsel to ensure the fairness of criminal proceedings, I would reach the same result in this category of cases. For the value of protecting our liberty from deprivation by the State without due process of law is priceless.

*Id.* at 59–60, 101 S.Ct. 2153 (citation omitted).

### III.

■ To summarize, the United States Supreme Court has instructed that courts de-

termining whether a particular indigent parent is entitled to court-appointed counsel must balance the presumption that the right to court-appointed counsel is triggered only when an indigent parent is threatened with the loss of his or her personal liberty against three due-process considerations: (1) the private interests at stake, (2) the government's interest, and (3) the risk that the failure to appoint counsel will lead to an erroneous decision. *Lassiter*, 452 U.S. at 31, 101 S.Ct. 2153. Because the private interests of the parents and the competing interests of the government are evenly balanced, the court's determination invariably hinges on the third factor. *Id.* (implying that ambiguity comes mostly in the third prong of the *Eldridge* analysis). *See also State v. Grannis*, 67 Or. App. 565, 680 P.2d 660, 664 (1984) (commenting that under *Lassiter*, "the nature of the parental interest and of the governmental interest are relatively constant and, generally, the only variable for the court to consider in deciding whether to appoint counsel is the extent of the 'risk that the procedures used will lead to erroneous decisions.'"); *In re Parental Rights as to N.D.O., T.L.O., and T.O.*, 121 Nev. 379, 115 P.3d 223, 226 (2005) ("We expect that both the parent's interests and the State's interests will almost invariably be strong in termination proceedings."); *S.C. Dep't of Soc. Servs. v. Vanderhorst*, 287 S.C. 554, 340 S.E.2d 149, 152–53 (1986) (applying *Lassiter* but only analyzing the "risk of error" prong of the *Eldridge* test); *State v. Min*, 802 S.W.2d 625, 626–27 (Tenn.Ct. App.1990) (holding that the interests of parents and the state in a termination-of-parental-rights proceeding are "evenly balanced" and that the risk-of-error prong was thus the "main consideration" in that case).

In *Lassiter*, the Supreme Court majority mentioned several factors that "may combine to overwhelm an uncounseled parent" and heighten the risk of an erroneous deprivation of a parent's rights:

> [T]he ultimate issues with which a termination hearing deals are not always simple, however commonplace they may be. Expert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented. The parents are likely to

be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation.

452 U.S. at 30, 101 S.Ct. 2153. The Supreme Court also noted that "[s]ome parents will have an additional interest to protect. Petitions to terminate parental rights are not uncommonly based on alleged criminal activity. Parents so accused may need legal counsel to guide them in understanding the problems such petitions may create." *Id.* at 27 n. 3, 101 S.Ct. 2153.

■ Applying the *Lassiter* balancing test to Father, we conclude, in light of the record, that he was denied his constitutional right to due process when he was not provided with counsel until sixteen days prior to trial.

## A.

The record indicates, first of all, that Father did not graduate from high school or obtain a general-education diploma. Father had a fifth-grade reading level, "low average" intelligence (with an intelligence quotient of 89), a "low average vocabulary," and average "abstract concept formation ability." His life and life situations were difficult and he demonstrated difficulty grasping the complexities of the issues and procedures before the family court.

Additionally, Father was on probation, apparently for a drug-related offense, during the proceedings below, and some of the conditions of his probation, for example, the requirement that he undergo periodic drug-testing, seemingly overlapped with the conditions imposed on him by the family court. Since the petitions in Cases 1 and 2 and DHS's motions for permanent custody were premised in part on Father's history of substance abuse and past abuse and neglect of Children, areas of concern for DHS, Father would have benefitted from the guidance of counsel to ensure that he did not incriminate himself as to possible criminal charges.

The record also reveals that Father was marginalized and confused during the proceedings below, and he was definitely not an

active participant who was able to protect his own interests. At the February 28, 2006 hearing, for example, a great deal of discussion took place about Father's paternity, the options available to Father to establish his paternity, and whether Father should establish his paternity. However, except to answer an initial inquiry as to his name, Father was not addressed at all during the hearing. Father's paternity status as to L.A. was clearly complicated, as even DHS's attorney conceded, because Mother had been married to Deceased Husband at the time of L.A.'s birth and L.A. had been receiving social security benefits following Deceased Husband's death. Such benefits would cease if Father acknowledged his paternity of L.A. or was adjudicated to be L.A.'s biological father, and Father would then become statutorily responsible for L.A.'s support, even if Father's parental rights in L.A. were terminated. It was important for Father to understand the legal ramifications of his paternity status as to Sons.

Additionally, the petitions filed by DHS on November 18, 2003 in Cases 1 and 2 sought foster custody of Sons and named Father as Sons' "Alleged Natural Father." Although the petition in Case 1 (as to L.A.) was not served on Father until March 4, 2004 and the petition in Case 2 (as to J.A.) was not served until November 16, 2004, the family court nevertheless entered orders that affected Father's rights and duties as to Sons. Furthermore, the record reflects that because Father was not initially served with the petitions, he did not receive notice of certain family court proceedings, and when he failed to appear at these proceedings, he was defaulted and denied notice of future hearings, at which he understandably seldom appeared—a chain of events that could have been broken if Father had had counsel. Father's failure to comply fully with the family court's orders and attend scheduled court proceedings factored into the family court's decisions regarding Father's parental rights.

**39.** Rule 12(a) of the Hawai'i Family Court Rules (HFCR) provides, in relevant part: "A defendant shall serve an answer within 20 days after the service of the summons and complaint upon that defendant, except when ... a different time is prescribed in an order of court under a statute or rule of court."

Finally, the record reveals that a potential conflict of interest existed between Parents because DHS reports implied that if Parents chose to stay in their sometimes-abusive relationship, the safety risks to Children were heightened. Yet, Father was the only party to Cases 1 and 2 who was not represented by any type of counsel during most of the proceedings below.

Based on our review of the record, it is apparent to us that the belated appointment of an attorney for Father created an appreciable risk that Father would be erroneously deprived of his parental rights in Sons. This risk was heightened when, sixteen days before trial, after Father was finally appointed an attorney, the family court denied that attorney's request for a continuance. According to the record, another attorney showed up to represent Father at trial.

Applying the case-by-case balancing test of *Lassiter*, we conclude that Father was deprived of his due-process right under the United States Constitution when he was not appointed counsel until sixteen days prior to trial.

### B.

It appears from the record that the main reason the family court did not appoint counsel for Father until sixteen days prior to the permanent-custody trial was that Father's paternity as to Sons had not been adjudicated until that point in time. Since Father admitted during the proceedings below that he was Sons' father, we conclude that the family court erred in conditioning Father's right to counsel on Father's formal establishment of his paternity.

The petitions in Cases 1 and 2 claimed that Father was the "Alleged Natural Father" of Sons. Although Father did not file a written answer to the petitions, admitting these allegations,[39] he orally told the court on several

At oral argument, the deputy attorney general representing DHS mentioned that parents never file answers in child-protective proceedings. Our own observations of the records in termination-of-parental-rights appeals confirms this representation. The failure of parents to file answers in child-protective proceedings is trou-

occasions that he was Sons' father, once even requesting to be put on J.A.'s birth certificate. The record also indicates that Father held himself out as Sons' father, Mother acknowledged that Father was Sons' biological father, and Father's brother and sister-in-law were helping to care for Sons. Despite Father's admission of his paternity, the family court never orally advised Father of his right to be represented by counsel in Cases 1 and 2, and that if he were indigent, the family court, in its discretion, *may* appoint counsel for him. Indeed, the first time the family court personally addressed Father and advised him of any right to appointed counsel was on April 26, 2006, more than two years after Father had been served with the petition in Case 1, and this advisement related to Father's right to be represented by counsel in the proceeding to establish his paternity, not in Cases 1 and 2. If it was the family court's policy not to provide Father with counsel in Cases 1 and 2 unless he had formally established his paternity, that policy was not expressly or clearly communicated to Father.

■ Where an alleged natural father's paternity of a child is in question, we believe it is incumbent on the family court to resolve the question as expeditiously as possible after the commencement of child-protective proceedings. A determination of an alleged natural father's paternity is essential to a permanent custody order that divests the alleged natural father of his parental rights in his children, for there is no need to terminate rights in a child that an alleged father does not have.

In *Estes v. Dallas County Child Welfare Unit of Texas Dep't of Human Servs.*, 773 S.W.2d 800 (Tex.App.1989), Estes, the alleged biological father of a child appealed a judgment terminating his rights in the child. Estes had filed, *pro se*, an answer to a petition for termination of his rights, generally denying the allegations in the petition but alleging that he was an indigent parent and requesting court-appointed counsel. The tri-

al court denied his request for an indigency hearing and for appointment of counsel, finding that Estes "had failed to respond by timely filing an admission of paternity or a counterclaim for paternity or for voluntary legitimation as required by section 15.023 of the Texas Family Code." *Id.* at 801. Reversing, the Texas Supreme Court held that Estes's allegation in his *pro se* answer that he was an "indigent parent," along with the child's guardian ad litem's statement that Estes described himself as an indigent parent, were sufficient to constitute a timely filed admission of paternity and notification of his intent to oppose termination of his rights with respect to the child. The Texas court reasoned:

> Because the natural rights existing between a parent and child are of constitutional dimensions, involuntary termination proceedings must be strictly scrutinized. The rights of biological fathers of illegitimate children are protected by the Texas Equal Rights Amendment, Tex. Const. art. I, § 3a. In applying the required strict scrutiny to this case, we are compelled to agree with the arguments stated by Estes and the guardian ad litem. Estes's answer was sufficient to indicate that he was admitting, and, indeed, asserting paternity. We hold that his answer constituted an admission of paternity that was timely filed since it was filed prior to the final hearing in the suit for termination. The trial court erred in ruling otherwise.

*Id.* at 802 (citations omitted).

We similarly hold that the family court erred when it seemingly concluded that Father, who had admitted his paternity of Sons, was not entitled to be provided with counsel until he had established his paternity as to Sons.

### C.

In light of our conclusion that Father was deprived of due process under the *Lassiter*

blesome and underscores the importance for parents in such proceedings to have appointed counsel who can guide them whenever DHS seeks to remove a child from the family home. A written answer is important because it helps to frame the

issues that are in dispute in a case and the statutory elements that must be established by DHS in order to gain family supervision, foster custody, or permanent custody of the children involved in a child-protective proceeding.

test when he was not provided appointed counsel until two weeks before trial, we need not decide in this case whether to join the vast majority of states that require, as a bright-line rule, that counsel be appointed for indigent parents in all termination-of-parental-rights cases. We express grave concerns, however, about the case-by-case approach adopted in *Lassiter* for determining the right to counsel. As Justice Blackmun observed, such an approach

> places an even heavier burden on the trial court, which will be required to determine in advance what difference legal representation might make. A trial judge will be obligated to examine the State's documentary and testimonial evidence well before the hearing so as to reach an informed decision about the need for counsel in time to allow preparation of the parent's case.

*Lassiter*, 452 U.S. at 51, n. 19, 101 S.Ct. 2153 (Blackmun, J., dissenting). Because the *Lassiter* dissents present compelling arguments for a bright-line rule regarding the provision of counsel in termination-of-parental-rights cases, we invite DHS, the Department of the Attorney General, and the Hawai'i Legislature to re-examine the discretionary nature of HRS § 587–34.

### CONCLUSION

Based on the foregoing discussion, we affirm the August 14, 2006 Orders in Cases 1 and 2 as to Mother. We vacate, as to Father, the August 14, 2006 Order entered in Case 1 as to L.A. and the August 14, 2006 Order entered in Case 2 as to J.A., and we remand for further proceedings.

On remand, we instruct that foster custody of Sons shall remain with DHS, Sons shall remain in the foster home of their paternal uncle and aunt, and DHS shall prepare a new safe-family-home plan for Father.